IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MARK WESTLEY ERWIN,
      Petitioner,

vs.                                 Case No.:  3:12cv115/LAC/EMT

SECRETARY, DEP'T OF CORR.,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 14).  Petitioner filed a reply (doc. 19).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 14).[1]  Petitioner was originally charged in the Circuit Court in and for Okaloosa County, Florida, Case No. 2005-CF-002032, with one count of attempted sexual battery while in a

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 14).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

position of familial or custodial authority (Count 1), one count of contributing to the delinquency of a child by an act causing or tending to cause a minor to become delinquent (Count 2), and one count of using a computer to facilitate or solicit the sexual conduct of a child (Count 3) (Ex. A at 22–23). The case was transferred to the Circuit Court in and for Walton County, Florida, Case No. 2005-CF-000798 (*id.* at 1, 6–7), and the State amended the information to add a charge of attempted unlawful sexual activity with a minor (Count 4) (Ex. B at 209). Following a jury trial in September of 2006, Petitioner was found guilty as charged (Ex. B at 251, Exs. E, F, G). On November 16, 2006, Petitioner was sentenced to ten (10) years of imprisonment followed by five (5) years of probation on Count 1, a concurrent term of eleven (11) months and twenty-nine (29) days of imprisonment on Count 2, a concurrent term of five (5) years of imprisonment on Count 3, and a concurrent term of five (5) years of imprisonment on Count 4, all with pre-sentence jail credit of 62 days (Ex. B at 277–82, Ex. H).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D06-6119 (Ex. I). On May 8, 2008, the First DCA affirmed the judgment as to Counts 1, 2, and 3 but reversed the conviction on Count 4 (Ex. K). Erwin v. State, 983 So. 2d 58 (Fla. 1st DCA 2008) (Mem). On July 10, 2008, the state circuit court issued an order directing the clerk of court to correct/amend the judgment to reflect that the conviction on Count 4 was vacated (Ex. L). An Amendment Judgment was rendered the same day (*id.*).

On February 11, 2009, Petitioner filed a motion for postconviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. M at 1–29). In an order rendered March 12, 2010, the circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion within thirty (30) days (*id.* at 107–17). The circuit court expressly advised Petitioner that the order was a non-final non-appealable order (*id.* at 115).[2] On April 9, 2010, Petitioner filed a petition for writ of certiorari in the First DCA, Case No. 1D10-1864, seeking review of the circuit court's non-final order and requesting that the First DCA "quash" the order of dismissal and permit him a reasonable time to file an amended Rule 3.850 motion (Ex. N at

---

[2] While Petitioner's Rule 3.850 motion was pending, he filed a petition for writ of mandamus in the First DCA, Case No. 1D09-6488, seeking to compel a ruling on his Rule 3.850 motion (*see* Ex. M at 101). The First DCA dismissed the petition as moot on April 1, 2010 (*id.* at 158).

160–66). The First DCA denied the petition on May 14, 2010, stating, "Petitioner has failed to demonstrate an injury which cannot be remedied by appeal from final order" (*id.* at 219). The mandate issued July 13, 2010 (*id.* at 218). Erwin v. State, 37 So. 3d 904 (Fla. 1st DCA 2010) (Mem). On September 30, 2010, Petitioner filed a "Motion to Compel Final Ruling on Defendant's Post Conviction Motion" (*id.* at 220–22). On December 22, 2010, the state circuit court allowed Petitioner an additional sixty (60) days to file an amended Rule 3.850 motion, providing that if Petitioner filed an amended motion within that time, it would be deemed to relate back the date of filing of his original motion on February 13, 2009 (*id.* at 223–29). Petitioner filed an amended motion on January 25, 2011 (*id.* at 235–71). The state circuit court summarily denied the motion on August 15, 2011 (Ex. O). Petitioner appealed the decision to the First DCA, Case No. 1D11-4836 (Ex. P). The First DCA affirmed the judgment per curiam without written opinion on January 11, 2012, with the mandate issuing February 7, 2012 (Exs. R, S). Erwin v. State, 77 So. 3d 1258 (Fla. 1st DCA 2012) (Table).

Petitioner filed the instant federal habeas action on March 9, 2012 (doc. 1). Respondent asserts the petition appears to be timely, but "[i]f this court disagrees," it does not waive a statute of limitations defense (doc. 14 at 2).

II.      STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." <u>Neelley v. Nagle</u>, 138

---

[3] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* <u>Parker v. Head</u>, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" <u>Lockyer</u>, 538 U.S. at 73 (quoting <u>Williams</u>, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting <u>Williams</u>, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* <u>Henderson v. Campbell</u>, 353 F.3d 880, 890 n. 15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u>, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. <u>Holland v. Jackson</u>, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* <u>Bell v. Cone</u>, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." <u>Putman v. Head</u>, 268 F.3d 1223, 1241

(11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. See Gill, supra at 1291 (citing Harrington, 131 S. Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. See Harrington, 131 S. Ct. at 786; see also Gill, supra, at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones

v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

## III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[4] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state

---

[4] Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)  the applicant has exhausted the remedies available in the courts of the State; or
        (B) (i)  there is an absence of available State corrective process; or
            (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower court with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).  In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Id., 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order

to obtain federal review of the issue.[5]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  Id., 541 U.S. at 32.  This language, while not part of the Court's holding, provides helpful instruction.  With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[6]

---

[5] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

[6] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.

The Eleventh Circuit, prior to <u>Duncan</u>, had broadly interpreted the "fair presentation" requirement.  After <u>Duncan</u>, however, the Eleventh Circuit has taken a more narrow approach.  For example, in <u>Zeigler v. Crosby</u>, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003). The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words:  "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution.  *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  *See* <u>O'Sullivan</u>, 526 U.S. at 839–40, 848; <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* <u>Tower v. Phillips</u>, 7 F.3d 206, 210 (11th Cir. 1993); <u>Parker v. Dugger</u>, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would

---

*Id.*

be futile under the state's procedural default doctrine.  <u>Bailey</u>, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See* <u>Harris v. Reed</u>, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  <u>Lee v. Kemna</u>, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," <u>Siebert v. Allen</u>, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001), or in a manifestly unfair manner.  <u>Ford v. Georgia</u>, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); <u>Upshaw v. Singletary</u>, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[7]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice.  <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of

---

[7] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  <u>Marek v. Singletary</u>, 62 F.3d 1295, 1302 (11th Cir. 1995); <u>Alderman v. Zant</u>, 22 F.3d 1541 (11th Cir. 1994).

justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

Id.

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS[8]

Ground One:  "The state court decision in denying Petitioner's motion to dismiss and/or motion for judgment of acquittal concerning sufficiency of evidence on the Petitioner's position of custodial authority with respect to Count 1 of the amended information, is contrary to established federal law."

Ground One(a):  "Petitioner alleges that the state court erred in denying his motion to dismiss and/or motion for judgment of acquittal concerning sufficiency of evidence on Petitioner's position concerning the facilitation or encouragement of sexual conduct of the victim by the Petitioner through e-mails introduced into evidence with respect to Count 3 of the amended information."

Ground One(d):  "The state court erred by not instructing the jury properly on the legal definition of "custodial authority," "sexual battery," and/or "sexual activity," despite a question posed to the court by the jury, in violation of due process and equal protection of the law."

Ground One(e):  "The state court erred by allowing an un-redacted audiotape into evidence containing mention of issues previously suppressed by the state court, in violation of due process as afforded by the United States Constitution."

Ground One(f):  "The state court erred by allowing altered copies of forwarded e-mails in violation of Florida's 'best evidence' rule."

---

[8] The court has consolidated some of Petitioner's claims for organizational purposes.

(doc. 1 at 23–27, 31–34–36).[9]

As to each of these claims, Respondent contends Petitioner failed to exhaust it in state court, because he failed to present it as a federal claim on direct appeal of his conviction (doc. 14 at 3–4, 12–15). Respondent contends the claims are now procedurally defaulted (*id.*). Notwithstanding the procedural default, Respondent contends each of Petitioner's claims is without merit (*id.* at 4–5, 13–16).

In Petitioner's reply, he asserts he cited State v. Gray, 435 So. 2d 816 (Fla. 1983) in his brief on direct appeal of his conviction, and Gray relied upon two Supreme Court cases, Connally v. General Construction Co., 269 U.S. 385, 391, 46 S. Ct. 126, 127, 70 L. Ed. 322 (1926) and Grayned v. City of Rockford, 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) (doc. 19 at 7). Petitioner contends his reliance upon Gray was sufficient to fairly present his federal claims to the First DCA (*id.*).

The state court record demonstrates that in Petitioner's brief on direct appeal of his conviction, he framed each of his claims of trial court error raised in Grounds One, One(a), One(d), One (e), and One(f) (identified as Issues 1, 2, 5, 6, and 7 in his state appellate brief) in terms of state law without making any reference to federal law, and in the body of each of his arguments on these issues, he made no reference to the United States Constitution or federal law, and he cited no federal cases (Ex. I at 10–17, 31–42). He argued Florida law only. Although Petitioner is correct that he cited Gray in his appellate brief, and Gray relied upon federal law, Petitioner cited and relied upon Gray only in his argument of Issue 3 of his appeal (*id.* at 18–24). Nothing in Petitioner's brief put the state court on notice that the issues raised in Grounds One, One(a), One(d), One(e), and One(f) (Issues 1, 2, 5, 6, and 7 in his state appellate brief) were being presented as federal constitutional claims. Therefore, the undersigned concludes Petitioner's claims of trial court error raised in Grounds One, One(a), One(d), One(e), and One(f) were not fairly presented to the state court as federal constitutional claims and are thus unexhausted. *See, e.g.*, Ramos v. Sec'y, Dep't of Corr., 441 F. App'x 689, (11th Cir. 2011) (petitioner's federal sufficiency of evidence claim was not exhausted where petitioner made only passing reference to federal constitutional right to due process in arguing that trial court

---

[9] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

improperly denied motion for judgment of acquittal because State failed to sufficiently prove premeditation element of murder); Pearson v. Sec'y, Dep't of Corr., 273 F. App'x 847, 850 (11th Cir. 2008) (petitioner's federal sufficiency of evidence claim was not exhausted where petitioner cited exclusively to Florida cases in state court and addressed Florida law in all of his substantive arguments, even though Florida courts assess sufficiency of evidence under standard identical to federal standard); Cook v. McNeil, 266 F. App'x 843, 845–46 (11th Cir. 2008) (petitioner did not alert the state court to the alleged federal nature of his sufficiency of the evidence claim and therefore failed to exhaust his federal due process claim; even though petitioner moved for judgment of acquittal and although Florida courts assess the sufficiency of the evidence under the standard applied in Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 2798, 61 L. Ed. 2d 560 (1979), petitioner cited exclusively to the state cases and all of his substantive arguments addressed Florida law; "the tenor of [petitioner's] narrow arguments that challenged the characterization of his knife and the sequence of his actions under the Florida statute did not bring a federal claim about due process to the attention of the state appellate court."); Torres v. McNeil, No. 3:08cv396/LAC/EMT, 2010 WL 5849880, at *12 (N.D. Fla. Nov. 3, 2010), *Report and Recommendation Adopted by* 2011 WL 674890 (N.D. Fla. Feb. 16, 2011) (petitioner did not alert state court to federal due process claim with respect to admission of Williams rule evidence; although petitioner sprinkled his argument in his state appellate brief with assertions that trial court's evidentiary ruling deprived him of a fair trial, he did not argue the issue as a federal due process issue or otherwise indicate a federal law basis for his claim).[10] *But see* Mulinix v. Sec'y for Dep't of Corr, 254 F. App'x 763 (11th Cir. 2007) (petitioner's federal sufficiency of evidence claim was exhausted where petitioner presented identical argument to state and federal courts, and Florida courts' sufficiency of evidence standard was identical to federal standard).

Now, any further attempt at exhaustion in the state courts would be futile, because Petitioner's claims would be procedurally barred under Florida law. *See* Rodriquez v. State, 919 So. 2d 1252, 1262 n.7 (Fla. 2005) (holding that issues were procedurally barred because they should have been, but were not, raised on direct appeal); Smith v. State, 445 So. 2d 323, 325 (Fla. 1983) ("Issues which

---

[10] The undersigned cites unpublished opinions of the Eleventh Circuit only as persuasive authority and recognizes that the opinions are not considered binding precedent. *See* 11th Cir. R. 36-2.

either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.").

As discussed *supra*, to overcome a procedural default such that this court may consider the merits of his claims, Petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. Petitioner has not alleged cause for the procedural default of the claims raised in Grounds One, One(a), One(d), One(e), and One(f). Moreover, Petitioner has not shown he is entitled to federal review of these claims through the "fundamental miscarriage of justice" exception to the procedural bar. Therefore, Grounds One, One(a), One(d), One(e), and One(f) are procedurally defaulted, and the merits of the claims will not be considered by this court.

> B.    Ground One(b): "The state court erred in denying Petitioner's motion to dismiss and/or motion for judgment of acquittal concerning sufficiency of evidence on the Petitioner's position concerning the intent to penetrate the vagina of the victim with respect to Counts 1 and 4 of the amended information, contrary to established federal law."

Petitioner asserts that Count 1 of the amended information alleged he, while in a position of familial or custodial authority, attempted to commit sexual battery by using his hands and/or a vibrator to stimulate, penetrate, or attempt to penetrate the vagina of the victim, in violation of Florida Statutes §§ 794.011(8)(b) and 777.04 (doc. 1 at 27). Petitioner asserts Count 4 of the amended information alleged he attempted to engage in sexual activity with the victim by using his hands and/or a vibrator to stimulate, penetrate, or attempt to penetrate the vagina of the victim, in violation of Florida Statutes §§ 794.05 and 777.04 (*id.* at 27–28). Petitioner asserts defense counsel argued for dismissal of the charges on the ground that there was no evidence of Petitioner's intent to penetrate, but the state court denied the motion to dismiss (*id.* at 28). Additionally, defense counsel made a motion for judgment of acquittal, both at the close of the State's case and the close of the evidence, arguing the evidence was insufficient to show either penetration or intent to penetrate, but the court denied the motions (*id.*). Petitioner contends the state court erred in denying the motion to dismiss and motions for judgment of acquittal, because the State failed to (1) allege a prima facie case as to each element required to convict Petitioner as to Counts 1 and 4, and (2) present sufficient evidence of each element at trial (*id.*).

Respondent contends any constitutional error with regard to Count 4 was cured or mooted when the state appellate court vacated the conviction and sentence on that count, and an amended judgment and sentence was entered (doc. 14 at 5). Regarding Petitioner's argument as to Count 1, Respondent contends Petitioner failed to fairly present a federal claim to the First DCA on direct appeal; therefore, the claim is unexhausted (*id.*). With regard to the merits of Petitioner's claim concerning Count 1, Respondent contends the evidence was sufficient to support the conviction for attempted sexual battery (*id.* at 5–6).

Respondent is correct that Petitioner is not entitled to relief on his claim that the State failed to allege the essential elements of the offense of attempted unlawful sexual activity with a minor in Count 4 of the information, and the evidence was insufficient to support his conviction for that crime. Any prejudice Petitioner suffered from the trial court's alleged error in denying the motion to dismiss and motion for judgment of acquittal was cured when the state appellate court vacated his conviction as to that count and an amended judgment was entered accordingly. Therefore, Petitioner's argument as to Count 4 is moot. *See, e.g.,* Lott v. Hargett, 80 F.3d 161, 167 (5th Cir. 1996) (habeas petitioner's trial counsel may very well have performed deficiently at 1982 sentencing hearing because he failed to advise petitioner that trial court could not legally sentence him to life in prison; however, prejudice which petitioner suffered as a result of counsel's failure was cured when petitioner was resentenced in 1982 to forty (40) years, beginning in 1982, which rendered his ineffective assistance of counsel claim moot); Evans v. Thompson, 881 F.2d 117, 124 (4th Cir. 1989) (petitioner could not demonstrate he was prejudiced by appellate counsel's failure to raise sentencing error because petitioner's original sentence was vacated in subsequent post-conviction proceeding, and he was resentenced free of error; therefore, any claims of prejudice from appellate counsel's error were mooted).

Regarding Petitioner's argument that the State failed to allege the essential elements of the offense of attempted sexual battery in Count 1 of the information, and the evidence was insufficient to support his conviction for that crime, although it is a close call, the undersigned concludes that Petitioner arguably fairly presented a federal claim to the state courts. In his argument of Issue 3 in his brief on direct appeal he stated:

> The Florida Supreme Court, in *State v. Gray*, 435 So. 2d 816 (Fla. 1983), specifically held that "Where an indictment or information wholly omits to allege one or more essential elements of the crime, it fails to charge a crime under the laws of the

> state. Since a conviction cannot rest upon such an indictment or information, the complete failure of an accusatory instrument to charge a crime is a defect that can be raised at any time—before trial, after trial, on appeal, or by habeas corpus." *Id.* at 818. The Court, in *Gray*, further held that ". . . a conviction on a charge not made by the indictment of information is a denial of due process of law." *Id.*

(Ex. I at 21–22). In <u>Gray</u>, the Florida Supreme Court relied upon federal law in deciding whether the charging document in that case sufficiently alleged certain matters that were essential elements of the offense sought to be charged to satisfy due process. 435 So. 2d 818 (citing <u>Thornhill v. Alabama</u>, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940); <u>De Jonge v. Oregon</u>, 299 U.S. 353, 57 S. Ct. 255, 81 L .Ed. 278 (1937)). Petitioner's argument was arguably sufficient to alert the state appellate court to the federal nature of his due process claim.

    1.  Clearly Established Federal Law

 It is a basic requirement of due process that the charging document provide a defendant with adequate notice of the crime with which he has been charged:

> The criteria [for a valid indictment] are, first, whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

<u>Russell v. United States</u>, 369 U.S. 749, 763–764, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962) (collecting cases) (internal quotations omitted); <u>DeBenedictis v. Wainwright</u>, 674 F.2d 841, 842 (11th Cir. 1982).

    Regarding sufficiency of the evidence, as an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict. In determining whether Petitioner's conviction was obtained with constitutionally infirm evidence, reference must be made to the substantive elements of the offense as defined by state law. <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 & n.16, 99 S. Ct. 2781, 2792 n.16, 61 L. Ed. 2d 560 (1979). To satisfy the constitutional requirement of due process during trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant. <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970). When reviewing a claim of insufficient evidence, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (citation omitted). The court should not reweigh the evidence but should view it in the light most favorable to the jury's verdict. *Id.* Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. *Id.* at 326. "It is only where, after viewing the evidence in its most favorable light and making all credibility decisions in favor of the state the evidence still fails to at least preponderate in favor of the state, that we become concerned with conflicting inferences." Cosby v. Jones, 682 F.2d 1373, 1383 (11th Cir. 1982) (footnote omitted). The test under Jackson is a limited one, and it does not require that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.*; Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir. 1987). "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." Wilcox, 813 F.2d at 1143.

2.      Federal Review of State Court Decision

As previously discussed, the First DCA affirmed Petitioner's convictions on Counts 1, 2, and 3 without discussion (Ex. K).

Florida law defines sexual battery as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object . . . ." *See* Fla. Stat. § 794.011(1)(h). One's finger is considered an "object" for purposes of § 794.011(1)(h). *See* Holmes v. State, 842 So. 2d 187, 188 (Fla. 2d DCA 2003) (citation omitted). To show an attempt, the State must demonstrate the defendant did "any act toward the commission of" the sexual battery, "but fail[ed] in the perpetration or [was] intercepted or prevented in the execution thereof . . . ." *See* Fla. Stat. § 777.04(1). To sufficiently allege an attempt in a charging document, the State must allege a specific intent to commit a particular crime and an overt act toward its commission. *See* State v. Walker, 705 So. 2d 589, 591 (Fla. 4th DCA 1998). "The intent and the act must be such that they would have resulted, except for the interference of some cause preventing the carrying out of the intent, in the completed commission of the crime." L.F. v. State, 421 So. 2d 198, 198–99 (Fla. 3d DCA 1982). Therefore, an act must go beyond mere preparation and planning. *See* Walker, 705 So. 2d at 590.

In the instant case, the amended information charged Petitioner in Count 1 as follows, in relevant part:

> [Petitioner], **between June 1, 2005 and July 22, 2005** at and in Walton County, Florida, did unlawfully, while in a position of familial or custodial authority, to a child twelve (12) years of age or older, but less than eighteen (18) years of age, to-wit: R.D.S., 17 years of age, attempt to engage said R.D.S. in an act which would constitute sexual battery by **using his hands and or a vibrator to stimulate, penetrate or attempt to penetrate the vagina of the R.D.S.**, in violation of Section 794.011(8)(b), and Section 777.04 Florida Statutes.

(Ex. B at 209).

Petitioner failed to demonstrate that the First DCA applied a rule that contradicts the governing law set forth in the Supreme Court's cases or that the court confronted a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a result different from Supreme Court precedent. Therefore, he has not shown that the First DCA's denial of his claim was contrary to clearly established federal law.

Further, he failed to show that the First DCA unreasonably applied Supreme Court precedent. As previously discussed, the AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See* Gill, *supra* at 1291 (citing Harrington, 131 S.Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 131 S.Ct. at 786.

In this case, the First DCA's denial of Petitioner's claim regarding the sufficiency of the charging document could have been based upon the theory that the charging document sufficiently alleged Petitioner was in a position of familial or custodial authority, he intended to penetrate the victim's vagina with an object, and he performed an act toward the commission of penetrating her vagina with an object. Therefore, the First DCA reasonably concluded Petitioner failed to show a due process violation with regard to the trial court's denial of defense counsel's motion to dismiss based upon the sufficiency of the information.

Petitioner's challenge to the state court's adjudication of his sufficiency of the evidence claim is also without merit. Florida courts have defined "custodial," in the context of the custodial sexual

battery offense, to mean simply "close family-type ties." <u>Stricklen v. State</u>, 504 So. 2d 1248, 1250 (Fla. 1st DCA 1986). One of the factors in determining whether a "close family-type tie" exists between a defendant and the victim is whether there is evidence of a recognizable bond of trust. *See* <u>State v. Rawls</u>, 649 So. 2d 1350, 155 (Fla. 1994). The purpose of the custodial sexual battery statute is "to penalize an adult who preys upon children, and who takes advantage of his or her [custodial] status to exploit children." <u>State v. Rife</u>, 733 So. 2d 541, 548 (Fla. 5th DCA 1999). With regard to intent, Florida courts have recognized that the intent of the defendant is "hardly ever subject to direct proof" and must usually be inferred from circumstantial evidence. *See* <u>State v. Hurley</u>, 676 So. 2d 1010, 1011 (Fla. 2d DCA 1996). "Whether an accused possesses the requisite intent is a question of fact for a jury." <u>Gill v. State</u>, 622 So. 2d 92, 93 (Fla. 2d DCA 1993). A trial court should "rarely, if ever," grant a motion for judgment of acquittal based on the State's failure to prove intent. *See* <u>Hurley</u>, *supra*.

At trial, the following evidence was admitted regarding Petitioner's position as the victim's custodian at the time of the attempted sexual battery. In 2000, Petitioner, a police officer, arrested the victim, then 13 years old, for a juvenile offense (Ex. F at 122, 187–88). The victim also ran away from home on several occasions (*id.* at 122). Petitioner occasionally visited the victim's home to check on her well-being (*id.* at 123). In approximately May or June of 2005, when the victim was 17 years old, the victim introduced Petitioner to Ms. Albert, the victim's caretaker (*id.* at 73, 91, 95). Petitioner was 46 years old at the time (*id.* at 92, 212). Petitioner informed Ms. Albert that he "wanted to be a mentor to [the victim] and make sure that she stayed out of trouble" (*id.* at 56, 74). Petitioner sought Ms. Albert's approval before taking the victim on trips or outings (*id.* at 57). The victim sought advice from Petitioner regarding her desire to become a pediatric nurse (*id.* at 131). Petitioner advised her to finish high school (*id.*). Petitioner also drove the victim to houses of family and friends, and to at least one medical appointment for the victim's infant son (*id.* at 135). Petitioner attempted to help the victim with legal issues, including child support issues (*id.* at 136–37). On June 30, 2005, Petitioner e-mailed the victim and told her he would help her get her life on the right path, with "no qualifiers this time[. Y]our mother would die! He he he." (Ex. B at 219, Ex. E at 65, 70). Petitioner then qualified his offer to help the victim, noting he would not do anything unreasonable,

"illegal, or immoral," but he would decide what qualified as unreasonable, illegal, or immoral (*id.*).

On the night of the attempted sexual battery, which occurred on a date in late June or early July of 2005, Petitioner took the victim to a Wal-Mart, but only because Ms. Albert approved (Ex. E at 94–97, 180–81). In a June of 2005 e-mail, Petitioner characterized himself as the victim's "crazy older boyfriend, mentor, protector, and the guy who loves you like nobody else can or ever will!" (Ex. B at 216, Ex. E at 100–01). The victim responded on June 28, "I LOVE YOU!" (*id.*). On August 9, 2005, Petitioner was interrogated by police after waiving his <u>Miranda</u> rights (Ex. E. at 187). He told police that he had a four-year relationship with the victim that had developed through meeting her as part of his duties as a police officer (*id.* at 187–88). He stated that the nature of his relationship was that he offered the victim family guidance, and he was the victim's mentor (*id.* at 188). Petitioner further stated the victim referred to him as an "older boyfriend," a "mentor," and a "protector" (*id.*). Petitioner told police the victim was under his custodial control at any time she was in his company, and the victim's caretaker had given him permission to oversee the victim's activities (*id.*). He stated the victim was not free to leave his company while they were together, and she was his responsibility when she was in his company (*id.*).

The evidence concerning the remaining elements of the attempted sexual battery included the following. Petitioner knew that the victim had an infant son and thus had been sexually active. On June 28, 2005, Petitioner sent the victim an e-mail in which he encouraged her to "think of the possibilities . . . He he he!" if they "tuckered out" the victim's infant son while the three of them were in Petitioner's car together (Ex. B at 214, Ex. E at 99–100). He also told her he was "[a]lways willing to aid, comfort and help with whatever I can, and I mean whatever!" (Ex. B at 214–15). He then proposed the following:

> I would love to have a bubble bath candle lit dinner with you also. That is unique to do. It is done in a large garden tub, filled with warm water. There is a board in between the two bodies that sit facing each other. There is soft music in the background and candles light the area. A soft flavorful red or white wine on ice and dinner is served on the board. Normally a 3 to 4 course meal. This is one of those times where the true flavor of the meal is the time it takes to finish it, slowly. Once the meal is concluded, you wash each other, dry each other, and go partake in desert [sic]. The dishes can wait.

See, I can and do have a lot of romanticist ideas and things to try and do.

(Ex. B at 214–15).  Petitioner concluded by stating, "I LOVE YOU!  You have made me very happy and I trust you completely with my heart and soul.  I am yours as much as I hope your [sic] mine." (*id.* at 215).  In another e-mail, Petitioner referred to himself as "the guy who loves you like nobody else can or ever will" (*id.* at 216).  In an e-mail to the victim dated June 30, 2005, Petitioner stated:

> What else can I say or do for you sweetness?
> What am I going to do with you??
> Yes, that is a loaded question so be careful how you answer it!
> I just might and probably will do it!  That should make you smile!

(Ex. B at 219–20).  When the victim was asked by defense counsel whether she considered any of Petitioner's e-mails as a solicitation for sex, she responded, "Not at first," and when defense counsel questioned her again, she responded, "Yes." (Ex. E at 139, 173).

On the night of the attempted sexual battery, after going to Wal-Mart, Petitioner and the victim went to Pizza Hut (Ex. E at 95).  The two ordered food through a drive-through window and drove to the restaurant's side parking lot (*id.* at 95–96).  The victim's infant son was asleep in the back seat of Petitioner's car (*id.* at 96).  Petitioner showed the victim a bullet-shaped vibrator, plugged it into the cigarette lighter, and while it was vibrating, put it in the victim's pants on the top fold of her vagina (*id.* at 96–97).  The victim testified her son awoke, and the encounter ended (*id.* at 97).  She testified she was sexually aroused and got "wet," and Petitioner appeared to be sexually aroused, because he was "adjusting himself" (*id.* at 97, 152–53).

In a police-monitored telephone conversation between the victim and Petitioner in July of 2005, Petitioner referenced the "explicit" and "steamy" nature of instant messages they had exchanged (Ex. E at 105–07, 197–200).  The two discussed their messages:

> MR. ERWIN: . . . When you talked about getting (inaudible) getting wet, we were instant messaging.
>
> [THE VICTIM]:  I didn't say anything about like going to—I don't know if I said anything about when we went to go to Pizza Hut and you used that little—What do you call it?
>
> MR. ERWIN: Oh, you asked something about you being sweet and I said you are.  But you didn't say specifically what that meant.

[THE VICTIM]:  Okay.

MR. ERWIN:  And if they ask you about it, you could say that you tried some new perfume and you asked me to put it—put it on a napkin or put it on my finger and you asked me to smell it.

[THE VICTIM]:  Okay.  I think (inaudible).

. . . .

MR. ERWIN:  Well, I'm going to get in trouble for the messages because they're out of line and inappropriate; okay?  But that's not anything they can send me to jail for; okay.  Don't worry.

[THE VICTIM]:  What do I do?

MR. ERWIN:  This is what you do; okay?  And I didn't tell you this.  Let me finish this here.  Just stick to your story about nothing happened.  And nothing did.  Just say—if they ask you about when you said, Did you like the way I tasted, tell them, I tried a little perfume and I put it on my finger; it was supposed to be strawberry.  How about that?

[THE VICTIM]:  Okay.

MR. ERWIN:  And I licked it; okay?  (Inaudible.)

[THE VICTIM]:  A (inaudible.)

MR. ERWIN:  That takes care of that if they say anything.  I can't remember all the instant messages.  Okay.  If they say anything about you getting wet—we did have one or two steamy instant messages; okay?  Just say we were talking.  Because we didn't plan anything; we didn't plot anything; we didn't coordinate anything.  I didn't tell you to do anything; you didn't tell me to do anything; okay?

[THE VICTIM]:  Okay.  Did I say anything about—did I mention it to you about the vibrator?  Did I say anything to you about that on any of the messages or any of the e-mails?

MR. ERWIN:  No.  That was face to face.

[THE VICTIM]:  I wouldn't know how to explain that one.

MR. ERWIN:  No.  If you did say anything, just tell them, you know, that you're complaining that that's the only sex you can have because of the (inaudible) is with a vibrator; okay?

(Ex. F at 197–200).

In light of the evidence and the Florida legal standards applicable thereto, the First DCA could have reasonably concluded that, viewing the evidence in the light most favorable to the State, there was enough evidence for the jury to find: (1) Petitioner was in a position of custodial authority over the victim at the time of the incident in his car in the Pizza Hut parking lot, (2) he intended to penetrate her vagina with the vibrator or his finger (as evidenced Petitioner's e-mail just prior to the incident describing the bubble bath and the "possibilities" if they tired the victim's baby while the three of them were in Petitioner's car, Petitioner's stimulating her in his car with his finger or the vibrator while the baby slept, and his instructing her to explain to police that any reference she may have made to a vibrator in her communications with him was merely her "complaining that that's the only sex you can have . . ."), (3) he performed an act toward penetrating her vagina with the vibrator or his finger (as evidenced by his stimulating her), and (4) the awakening of the victim's baby prevented Petitioner from actually penetrating her vagina. This conclusion was not contrary to or an unreasonable application of <u>Jackson</u>'s holding, that a conviction must be affirmed if, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. at 319. It is possible that fairminded jurists could disagree that the First DCA's adjudication of Petitioner's claim conflicts with <u>Jackson</u>, but that possibility only demonstrates that Petitioner is not entitled to federal habeas relief on his due process claim. *See* <u>Morton v. Sec'y, Dep't of Corr.</u>, 684 F.3d 1157, 2012 WL 2332758, at *6 (11th Cir. June 20, 2012) ("[W]e may issue a writ of habeas corpus only 'where there is <u>no</u> possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'") (quoting <u>Harrington</u>, 131 S. Ct. at 786) (emphasis added).

C. <u>Ground One(c): "Petitioner contends that the state court erred by not allowing any mention of past crimes or sexual conduct of the victim to show her bias and or motive to fabricate the allegations in Count 1 through 4 of the amended information, and contrary to established law."</u>

Petitioner asserts defense counsel sought to adduce the following evidence: (1) the victim had previous sexual relationships that resulted in her being charged as a juvenile with lewd and lascivious exhibition, (2) at the victim's sentencing on this charge, the judge warned her that any future inappropriate sexual behavior on her part could result in her arrest, and (3) the fear of losing her infant

son created a substantial motive for her to fabricate the allegations against Petitioner (doc. 1 at 29–31).  Petitioner states the trial court limited defense counsel's cross-examination of the victim on these issues based upon Florida's "rape shield" laws; thereby interfering with Petitioner's constitutional rights to confront his accuser (*id.*).

Respondent contends any challenge to Count 4 was cured or is moot (doc. 14 at 6); and the undersigned agrees, as discussed *supra*.  Respondent additionally argues Petitioner presents an incomplete record regarding the trial court's limitation of cross-examination, and in light of the complete record, the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 6–11).

1.      Clearly Established Federal Law

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The principal protection derived from the confrontation right is the right to effective cross-examination of the State's witnesses.  *See* Crawford v. Washington, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); United States v. Owens, 484 U.S. 554, 559, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).  Through effective cross-examination, the criminal defendant hopes to demonstrate to the jury of his peers why it should not believe this particular witness.  *See* Van Arsdall, 475 U.S. at 680. Effective cross-examination is therefore not limited merely to testimonial inconsistencies, but also the witness's "biases, prejudices or ulterior motives."  Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).  "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective whatever way, and to whatever extent, the defense might wish.'"  Owens, 484 U.S. at 559, (emphasis in original) (quoting Kentucky v. Stincer, 482 U.S. 730, 739, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)).

A Confrontation Clause violation arises when a criminal defendant shows "that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors

. . . could appropriately draw inferences relating to the reliability of the witness.'" <u>Van Arsdall</u>, 475 U.S. at 680 (quoting <u>Davis</u>, 415 U.S. at 318). Conversely, a Confrontation Clause violation does not arise, even where the defendant's cross-examination of a witness has been limited, when: ""(1) the jury, through the cross-examination permitted, was exposed to facts sufficient for it to draw inferences relating to the reliability of the witness; and (2) the cross-examination conducted by defense counsel enabled him to make a record from which he could argue why the witness might have been biased." <u>United States v. Calle</u>, 822 F.2d 1016, 1020 (11th Cir. 1987).

Specifically with regard to sexual battery cases, the Supreme Court has held that the privacy rights of rape victims are sufficiently important to justify some limitations on the accused's right to confrontation. <u>Michigan v. Lucas</u>, 500 U.S. 145, 149–50, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991) ("[Rape shield statutes] are a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy."). The Court further held that excluding marginally relevant evidence of prior sexual experience or activity is a permissible limitation on the defendant's right to confrontation. *See id.*, 500 U.S. at 149.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Issue 4 in his brief on direct appeal (Ex. I at 25–30). The First DCA affirmed Petitioner's convictions on Counts 1, 2, and 3 without discussion (Ex. K).

The theory of defense was that (1) the attempted sexual battery never occurred, (2) Petitioner's communications with the victim could not reasonably be construed as encouraging delinquent behavior, and (3) the e-mails between Petitioner and the victim could not reasonably be construed as a solicitation for sex (*see* Ex. F at 322–35). Shortly before the evidentiary portion of the trial began, the trial court inquired of counsel as to how Florida's "rape shield" statute would apply (Ex. E at 5). The statute, which the court read into the record, provided:

> (2) Specific instances of prior consensual sexual activity between the victim and any person other than the offender shall not be admitted into evidence in a prosecution under s. 794.011. However, such evidence may be admitted if it is first established to the court in a proceeding in camera that such evidence may prove that the defendant was not the source of the semen, pregnancy, injury, or disease; or, when consent by the victim is at issue . . . .

(Ex. E at 6–7, quoting Fla. Stat. § 794.022(2))). The court observed that the statute seemed to render "any prior relationships of the alleged victim" irrelevant (*id.* at 7). Defense counsel disagreed and

argued that the victim's prior sexual history and juvenile criminal history showed that she risked certain consequences for engaging in sexual behavior with Petitioner, which showed her bias or motive to fabricate (*id.* at 8–23).

> MR. WEINSTOCK [defense counsel]: Throughout her young life, I think from the age of thirteen to about the age of fifteen, she's had sex with at least three different adult men. All three of them have been prosecuted and are in jail for sex with a minor. She gave—she got pregnant at the age of sixteen, gave birth at the age of seventeen.
>
> The issues of her prior sexual conduct might come out to show—let me back off for a second, Your Honor.
>
> When she was in court, she—she mentioned in her deposition that she has been identified as being a sexual offender and she has pointed out that when she was in jail, she was isolated form other people because of her sexual offender status. She's under the belief—and I haven't verified this with anyone else but her—that if she gets in anymore trouble, in sexual trouble, then the Judge said that he was going to throw her in jail. She has been charged, as Mr. Schlechter [the prosecutor] let me know, as a principal to a lewd and lascivious, and I believe that was reduced down by Ginger Madden to I think two counts of felony battery. She has—
>
> MR. SCHLECHTER: With a withheld adjudication. And it's a juvenile case.
>
> MR. WEINSTOCK: Yes. She has all those—this prior history over her head with the knowledge that if she gets—possibly gets in trouble again, she's going to go to jail. She was under the—she believed, firmly believed, that she would lose her baby. And therefore, all this information goes to her motive, her bias to fabricate. And I firmly hold that if you—that this is an essential element of the defense and if you prohibit any questioning of this complaining witness, you are preventing me from establishing this key element of my defense, which will violate the defendant's constitutional right to confrontation. And it's also a due process violation.
>
> THE COURT: Here's what I'm going to do. Because it clearly says, in 794.02, that, "Specific instances of prior consensual sexual activity between the victim and any other person shall not be admitted," at this time, I'm not going to allow it. So you can't mention it in opening statement. Now, when the State calls the victim to the stand, before you go into that, if you'll let me know, I'm going to clear the courtroom and I'll let you do a proffer. Then the court will determine, based upon the proffer, whether or not it's admissible under the statute.

(Ex. E at 9–11). Defense counsel questioned the trial court whether he could mention in his opening statement that the victim was arrested by Petitioner in 2003 for domestic violence aggravated battery

(*id.* at 11).  The trial court permitted defense counsel to mention that she was arrested by Petitioner in 2003, because it was relevant to the victim's possible motive to fabricate, but counsel could not mention that she was charged with a crime (*id.* at 11–12, 22–23).  Defense counsel stated he also wished to mention in his opening statement that the victim was a "multiple runaway" (*id.* at 12).  The court allowed defense counsel to mention this (*id.* at 12–13).  However, the court ruled that evidence that the victim was charged as a principal to lewd and lascivious conduct was not admissible, because the charge did not result in a conviction (an adjudication of delinquency was withheld).  The court additionally ruled that the victim's juvenile conviction for a misdemeanor (stemming from the domestic violence incident involving the victim's step father) was not admissible (*id.* at 14–17).

During opening statements, defense counsel mentioned that Petitioner met the victim in 2000, when she ran away from home, was caught by police and returned home, and Petitioner, a police officer, performed a "welfare check" at her home (*id.* at 40).  Defense counsel stated Petitioner next met the victim in 2003, when he arrested her (*id.*).  Counsel stated since that arrest, the victim ran away from home numerous times, and when she was returned home, Petitioner performed "welfare checks" at her home (*id.*).

During the victim's testimony, the prosecutor elicited testimony regarding the incident with Petitioner at the Pizza Hut in June or July of 2005, and that she was 17 years old at the time of the incident (Ex. E at 91–97).  The victim also testified she and Petitioner communicated by e-mail, and she identified the e-mails she received from Petitioner described *supra* in Ground One(b) (*id.* at 99–103).  One of the e-mails from Petitioner included an attached statement he had drafted for her to provide to police, stating Petitioner "always acted as a gentleman and brother," and that she did not interpret his e-mail regarding the bubble bath as an offer for sex (Ex. B at 222).  The statement also included the following:

> I do love Officer Erwin but he is more like the brother I never had and I would like to think it is reciprocated, he has stated he loves me but I do not think it is the same way I love him.  I think it is on a lesser level.  He has always taken care to insure [sic] our meetings have been public and in plain view of people.  He has done nothing wrong or taken advantage of my situation or me.  He has always been proper in his actions with me.  I wish to express that thought and ask that this whole matter be dropped, nothing has happened between us and with him constantly reminding me of my obligations as a mother and under court orders, nothing I believe would ever or could ever happen.

(Ex. B at 222–23). The victim testified she signed the statement and provided it to police, but she admitted during her testimony that it was not truthful (*id.* at 104). She testified she subsequently told police her statement was not truthful and revealed what actually occurred between Petitioner and her (*id.*). The victim testified she was concerned about maintaining custody of her baby (*id.* at 104–05). The prosecutor asked her if she lied to protect her child, and she responded "No." (*id.* at 105). She testified she told the truth to protect her child (*id.*).

Defense proffered the following cross-examination of the victim: (1) she met Petitioner four or five years prior, when he arrested her because she threatened to kill her mother's husband; (2) after the arrest, she was taken to the Department of Juvenile Justice; (3) she was a runaway numerous times; (4) when she was returned home, a patrol officer, often Petitioner, came to her house to check her safety; (5) she was arrested a second time when she was 15 or 16 as a principal to lewd and lascivious conduct, based upon allegations that she had sex with an adult man; (6) she appeared before a judge on the lewd and lascivious charge, and the judge told her something in the nature of if he saw her again or if she was arrested again, he would throw her in jail; (7) three adult men were currently in jail for having sex with her, none of whom were the father of her child; (8) she "had in her mind" what the judge told her about what could happen to her if she became involved with an older man when she was questioned by police regarding her contact with Petitioner; (9) when she was initially questioned by police regarding the e-mails with Petitioner, she told them nothing happened between Petitioner and her, and that she was afraid of being arrested and losing her child; and (10) she could not remember how many times she was arrested as a juvenile, possibly more than five (*id.* at 109–19). The court ruled as follows:

> As it pertains to the juvenile criminal record, I've told you I'm going to allow you to ask only if Mr. Erwin arrested the [victim]. As to any charges or any offense, they would be unallowable under Florida Statute 90.610 specifically, which states, Evidence of juvenile adjudications are inadmissible under this subsection.
>
> So whether it's an adjudication or a withhold of adjudication, that's not admissible as to the rape shield statute.
> . . . .
> Specific instances of prior consensual sexual activity between the victim and other persons are not admissible [pursuant to the rape shield statute, § 794.022].
> . . . .

Mr. Weinstock has noted the <u>Lewis [v. State</u>, 91 So. 2d 922 (Fla. 1991)] case. The Court does not find that that is controlling in this incident.

. . . .

MR. WEINSTOCK: . . . Could you please identify why you feel that <u>Lewis v. State</u>—

THE COURT: I don't have to explain my ruling to you, Mr. Weinstock. But I will say that I don't think that that's controlling because it deals with a different set of circumstances. There's been nothing to tie up the other relationships to the credibility or the identities of this case; therefore, they're going to be disallowed.

MR. WEINSTOCK: How about the case <u>Catcher v. State</u>?

THE COURT: One more time: I've made my ruling and you've made your proffer and that the Court's ruling. Thank you.

. . . .

MR. WEINSTOCK: So I don't make a mistake—

THE COURT: I'm going to allow you to ask whether or not Mr. Erwin arrested her. You cannot go into the nature of those charges. The reason I'm allowing you to ask that question goes to potential bias. But the runaway, I've told you before I don't have a problem with you asking about that or the welfare checks. I'm not allowing, because it's contradictory to Florida law, you to question her about any other sexual relationship or sexual contact she may have had with anybody other than this defendant.

MR. WEINSTOCK: May I mention to her her understanding of what the Judge in Okaloosa County told her?

THE COURT: That would involve sexual contact with other men and that would also involve those juvenile criminal offenses, which are not admissible.

(Ex. E at 118–21).

During cross-examination of the victim, defense counsel elicited testimony that she was 18 years old at the time of trial, and her son was 20 months old (Ex. E at 122). She testified she first met Petitioner when he arrested her when she was 13 years old (*id.*). She testified that since that time, she ran away from home numerous times (*id.*). She testified that when she was returned home by police, officers, including Petitioner, conducted "welfare checks" at her home (*id.* at 122–23). She testified that when she was summoned to the police department for questioning regarding the e-mails with Petitioner, she felt "a little bit" intimidated (*id.* at 154–56). She admitted that during her deposition,

she was asked whether she felt she had to give police the information they were trying to get from her, and she answered, "In a way" (*id.* at 157). Cross-examination continued:

> Q: Okay. Again, do you recall the officer in the Fort Walton Beach Police Department asking: Has he tried to touch you; has he tried to do anything to you?
>
> And your answer was: Not at all, no.
>
> Do you recall that?
>
> A: Yes.
>
> Q: Okay. Do you recall Officer Berry at the Fort Walton Beach Police Department saying to you, quote: Has he made any suggestions that you go to a motel with him, have sex with him, anything; unquote?
>
> A: Yes.
>
> . . . .
>
> Q: Do you recall what your answer was?
>
> A: When I gave you that I probably said no.
>
> Q: You did say no. And this is back in January; nine months earlier than today. I asked you, ma'am, that when you went to speak to the Fort Walton Beach Police Department, I believe I asked you if you were nervous and intimidated. Do you remember that?
>
> A: Yes.
>
> Q: Why would you feel nervous and intimidated?
>
> A: Because I didn't want to say anything.
>
> Q: Did you feel nervous and intimidated because you felt that you might lose your son?
>
> A: In a way.
>
> . . . .
>
> Q: . . . When you talked to them, were you apprehensive that your son would be taken away from you?
>
> A: Maybe a little bit.
>
> . . . .

Q: . . . when you say "maybe a little bit," I need to know what that means in your mind. Were you apprehensive that you might lose Blake [her son]?

A: I just said yes.

Q: Thank you. Did the Fort Walton Beach Police Department people that you spoke to ever tell you that if you say what happened he will not be taken away from you?

A: Yes.

. . . .

Q: After they—I guess after they calmed your fear, that is when you told them the information they were trying to get from you?

A: I suppose.

Q: Okay. Were you apprehensive about losing Blake if you didn't assist them?

A: In a way.

Q: Did they do anything to give you that fear?

A: No.

. . . .

Q: Do you recall me asking you [during her deposition]: Did they do anything to give you that fear?

A: Yes.

Q: Do remember this answer?

A: I know what I said.

Q: Okay. Do you recall saying: They didn't have to; I know how they are?

. . . .

Q: Do you recall saying that?

A: Yes.

. . . .

Q: Ma'am, when you had your interview with the Fort Walton Beach Police Department, one of the questions they asked you was, quote: Have we made any promises to you today? Do you remember that question?

A:  Yes.

Q:  And do you remember your answer was, quote:  That I wouldn't get in trouble for this and that my son wouldn't be taken away from me; unquote.  Do you remember that?

A:  Yes.

. . . .

Q:  . . . [H]as anybody before threatened to take away your child?

A:  Yes.

Q:  Who would that be?

A:  My mother.

(Ex. E at 158–75).

Additionally, defense counsel elicited testimony from Tanya Albert, the victim's guardian, that the victim was "always nervous about losing her baby." (Ex. E at 79).  Defense counsel also elicited testimony from Ms. Albert that she and the victim had numerous arguments when the victim lived in her home, and Ms. Albert told the victim to leave and find another place to live when she discovered the e-mails between Petitioner and the victim, which she forwarded to the victim's mother (*id.* at 85–86).

Defense counsel elicited testimony from the victim's mother, Ms. Schafer, that Petitioner's arresting the victim when she was younger involved a dispute between the victim and Ms. Schafer's husband (Ex. F at 259).  Ms. Schafer also testified she forwarded the e-mails between Petitioner and the victim to police with a complaint after Tanya Albert forwarded the e-mails to her (*id.* at 268).

Defense counsel also elicited testimony from Rosemarie Berry, a captain with the police department, that the first time she summoned the victim to her office on July 21, 2006, the victim stated she was afraid that she could lose her baby and that she might be arrested (Ex. F at 227–28).  Captain Berry testified the victim was still fearful her baby was going to be taken away and that she was going to "get in trouble" during her second interview on July 22, 2006 (*id.* at 230).  Captain Berry testified she told the victim that she (the victim) was not the target of the police investigation, Petitioner was, and unless she (the victim) had done something wrong or had done something to her baby, nobody would take her baby away (*id.* at 231).

Defense counsel made the following arguments during closing:

You remember that [the victim] testified that she first met Mark Erwin when he arrested her. Now, she did not identify what the arrest was for, but her mother did; issues at home with her ex-husband, [the victim's] stepfather.

. . . .

[The victim] testified that Mark went to the hospital when, at the age of seventeen, she gave birth to her child.

. . . .

[The victim] testified that after Wal-Mart, she and Mark went to Pizza Hut. This is where she claimed this incident where Mark touched her with a vibrator took place.

. . . .

In fact, if you will remember, [the victim] changed her answers a number of times after I approached her and showed her, Do you remember your deposition in January of 2006. I can't count the number of times that I had to walk up there to get her to remember yesterday what she testified to in January that was different than the answers that she gave to the government attorney. You heard all the conflicts there.

But in particular, I ask you to remember when I specifically read her the question in the deposition, quote, Has he tried to touch you; has he tried to do anything to you, unquote?

Remember her answer? Not at all, no.

. . . .

Now let me talk about [the victim's] interaction with the Fort Walton Beach Police Department. Do you remember that I asked [the victim] if she felt that she had to give them the information that they were trying to get? She answered, In a way, yes; in a way.

Do you remember that each of the government witnesses from the Fort Walton Beach Police Department told you that [the victim] was apprehensive about getting arrested and losing her baby? And each of the Fort Walton Beach Police Department interrogators addressed this issue with her; her baby and her arrest. What was [the victim's] testimony about the Fort Walton Beach Police Department when I asked her, Did they do anything to give you that fear? Remember her answer? It was very telling; They didn't have to; I know how they are. And in [the victim's] mind, there was a real possibility of losing [her child] because she knows how they are.

. . . .

[The victim] wrote a letter that is part of the evidence that has been admitted. She wrote this letter on July 18th 2005. Six months later I took her deposition. She said nothing about this being created for her in her deposition. She stood by this. And what did she say in this? You'll get the chance to read it. But she says he has never done anything wrong; he's always acted like a gentleman with her; she has asked him

questions and he's answered them through instant messaging. In fact, she even identifies him as her life line. But today—this was dated July 18 of 2005. Now she's changing her story about the authorship of this document; not on these days; not in August, September, October, November; she's changing her story over a year later; yesterday, after spending time in the state attorney's office going over her testimony. Not once did she deny authorship of this until yesterday. Well, this letter says nothing happened, basically. You'll get a chance to read it.

But now, this letter was created on the 18th and on the 21st she has her first meeting with the Fort Walton Beach Police Department. I believe she met with Captain Rose Berry. What fear; what apprehension did they fill her with? Why did they, time after time, say to her that they have no intention of taking her baby and she'll not be arrested? Isn't once enough? But when you say it over and over and over and over, are you trying to inflict—are you trying to generate a feeling of fear and apprehension in that person?

(Ex. F at 322–30).

In 2006, three cases guided the States' ability to limit cross-examination into a witness's biases: Davis, Van Arsdall, and Olden v. Kentucky, 488 U.S. 227, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988). As recognized by the Eleventh Circuit in Childers v. Floyd, 642 F.2d 953, 973 (11th Cir. 2011), these cases create the anchor against which the federal court evaluates the state court's decision. The Eleventh Circuit examined what, precisely, the three seminal cases held:

From these three cases, two "rules" emerge. First, trial courts may not prohibit all questioning into witnesses' biases. In each of the precedential cases, the trial court barred the defense from informing the jury of the witness's potential bias and how that might affect the witness's testimony. The Court, therefore, never had occasion to require trial courts to permit cross-examination on more than the existence of a bias.

The Court's seemingly broad language in articulating the confrontation right should not widen this narrow rule on habeas review. In two of these cases, the Court stated that trial courts must permit all cross-examination that might provide the jury with "a significantly different impression" of a witness's credibility. Olden, 488 U.S. at 232, 109 S. Ct. at 483; Van Arsdall, 475 U.S. at 680, 106 S. Ct. at 1436. Extrapolated, this statement could be read to require far more extensive questioning than simply regarding the existence of a bias. AEDPA prevents us from doing so; federal habeas courts judge state courts against the Supreme Court's holdings, not its dicta. Terry Williams, 529 U.S. at 413, 120 S. Ct. at 1523. Broad language—i.e., dicta—does not permit us to expansively apply the Court's holdings far beyond the facts of those cases. See Callahan v. Campbell, 427 F.3d 897, 930 (11th Cir. 2005) (focusing on the specific facts of Supreme Court precedent, rather than the Court's general language, to determine clearly established Supreme Court precedent).

Therefore, for the purposes of defining "clearly established federal law" under AEDPA, a state court satisfies the "significantly different impression" test when it permits some questioning about a witness's biases.

That standard does not, however, tell the state courts how deeply they must permit the defendant to delve into those biases. This uncertainty leads to the second "rule": trial courts have wide discretion to limit cross-examination when they have allowed the defendant to expose some evidence of bias. Courts may limit cross-examination for the same factors used in Federal—and Florida—Rule 403: harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.

Childers, 642 F.3d at 975. The Eleventh Circuit then noted the "multiple layers of deference" owed to the state court's decision:

When evaluating the Florida court's actions at this juncture, we must keep in mind the multiple layers of deference owed to the state court's determination. First, even on direct review, we would apply the deferential abuse of discretion standard to limitations on cross-examination. [ ] Second, AEDPA requires us to defer to the state court's decision unless it was unreasonable. 28 U.S.C. § 2254(d)(1). And third, the state court's factual findings must be presumed correct. *Id.* § 2254(e)(1). These layers point to the exceptional deference owed to the state court here.

*Id.* at 979 (citation omitted).

In the instant case, through defense counsel's cross-examination of the victim and Tanya Albert, and counsel's direct examination of the victim's mother, the jury learned that the victim had a history as a runaway, she was arrested by Petitioner when she was 13, she became pregnant when she was 16 and was forced to leave her mother's home, and she gave birth when she lived with Ms. Albert and was asked to leave Ms. Albert's home upon discovery of the e-mails between her and Petitioner. Through the testimony of the victim and Captain Berry, the jury also learned that the victim initially told police that nothing inappropriate occurred between Petitioner and her, but she felt somewhat apprehensive about losing custody of her child and being arrested if she did not assist police, and after the officers promised she would not get in trouble or lose her child, she told them about the vibrator incident and agreed to participate in the police-monitored telephone conversation with Petitioner. The jury was exposed to the victim's relevant motive to fabricate—fear of facing juvenile criminal charges and losing custody of her child if she did not cooperate with police. Because the trial court did not allow questioning regarding her history of sexual contact with other

adult men, or her juvenile criminal history (including the fact that she was arrested as a principal to lewd and lascivious conduct, and the juvenile judge threatened that if she was arrested or appeared before him again, he would put her in jail), the jury was not aware of how close the victim actually came to potential juvenile criminal consequences for her involvement with Petitioner. However, those were merely additional facts underlying the victim's same motive to fabricate—her fear of separation from her son as a result of a "consensual" sexual relationship with an adult man. Moreover, the excluded evidence would have tended to prove only that the victim was motivated to lie about the factually "consensual" nature of her sexual contact and communications with Petitioner (obviously it was not legally consensual because the victim was only 17). The excluded evidence of her sexual and juvenile history would not have tended to prove she was motivated to fabricate the contact itself.

Because the jury, through the cross-examination permitted, was exposed to facts sufficient to draw inferences relating to the victim's reliability and credibility, and the cross-examination conducted by defense counsel enabled him to make a record from which he could argue why the victim might have been motivated to fabricate, the trial court—as affirmed by the First DCA—did not unreasonably apply Supreme Court precedent in denying Petitioner's constitutional claims regarding the limitation of evidence of the victim's past sexual conduct with other adult men and more details of her juvenile criminal history. Therefore, Petitioner failed to demonstrate he is entitled to federal habeas relief on Ground One(c).

    D.    <u>Ground One(g):</u>  "The state trial court erred by not allowing the Petitioner to proffer evidence to show the bias witness [sic], in violation of due process and the right to confrontation."

Petitioner contends the trial court violated his due process rights and his right to confront witnesses against him by denying the defense an opportunity to proffer expected testimony of Captain Berry to show her bias (doc. 1 at 37).

Respondent contends this claim presents purely a state law evidentiary issue, not a federal claim (doc. 14 at 16). Respondent additionally contends Petitioner failed to present a federal claim in state court (*id.*). Notwithstanding the failure to exhaust, Respondent argues any trial court error had no substantial influence on the verdict and was thus harmless (*id.*).

According to the trial transcript, the alleged error occurred during defense counsel's direct examination of Captain Rosemarie Berry, the lead investigator in Petitioner's criminal case (Ex. F at

233). Defense counsel asked Berry whether she thought her investigation was "totally impartial," and Berry responded, "Yes." (*id.*). Defense counsel then asked, "You put your name in the hopper for promotion to Chief of Police at the Fort Walton Beach Police Department?" (*id.*). The prosecutor objected, and the trial court sustained the objection on the ground that it was not relevant (*id.*). Defense counsel asked, "May I proffer? It's important to the case." (*id.*). The trial court denied counsel's request (*id.* at 233–34).

In Issue 8 of Petitioner's brief on direct appeal of his conviction, he argued the trial court violated his due process rights and his "right to Confrontation" by refusing to allow the defense to proffer expected testimony from Captain Berry to show witness bias (Ex. I at 43–45). Petitioner quoted Rozier v. State, 636 So. 2d 1386, 1388 (Fla. 4th DCA 1994), in which the Fourth DCA stated, "The disallowance of the proffer thwarts a defendant's right to cross examine witnesses guaranteed by the [S]ixth [A]mendment and article I, section 16 of the Florida Constitution." (*id.* at 44). Petitioner argued the defense's request to proffer Ms. Berry's testimony was reasonably related to the issue of bias of a State's witness; therefore, the trial court erred by refusing the proffer (*id.* at 44).

Petitioner failed to assert the nature of Captain Berry's expected testimony in his appellate brief, or demonstrate the relevance of the expected testimony; he argued only that investigators were biased against him, and their bias skewed their investigation, including their interrogation of the victim. Even when viewed in the context of counsel's question to Berry regarding whether she had sought a promotion, counsel failed to demonstrate to the First DCA that Captain Berry had a relevant bias. Because counsel failed to show a potential relevant bias and how that might affect Berry's testimony, the First DCA's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law.

   E.   Ground Two: "Petitioner was denied effective assistance as guaranteed by the U.S. Constitution, as well as due process and equal protection under the law, when counsel failed to object and challenge police activity that led to entraping [sic] the Petitioner, to obtain evidence to support conviction for Count 2 of the information and support the State's case altogether."

Petitioner contends defense counsel should have objected to or challenged law enforcement's involvement in the telephone conversation between him and the victim (doc. 1 at 42–45).[11] He asserts while police were investigating the alleged crimes, the victim called him, and the conversation was recorded by police (*id.* at 43). Petitioner contends counsel should have argued the police activity constituted entrapment (*id.* at 42–25). He further argues his statements to the victim were "induced by police with threats" and used against him at trial, in violation of the Fifth Amendment (*id.* at 43–44).

Respondent contends the state court's adjudication of this claim was not contrary to or an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) (doc. 14 at 18).

1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." <u>Strickland</u>, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many

---

[11] This conduct was the basis of Count 2, which charged Petitioner with contributing to the delinquency of a child.

reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. See Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Further, when the claimed error of counsel occurred at the guilt stage

of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal. *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his amended Rule 3.850 motion (Ex. N at 241–45). In the state circuit court's written decision denying the claim, the court correctly stated the deficient performance and prejudice prongs of the Strickland standard as the applicable legal standard (Ex. O at 320). The court adjudicated the claim as follows:

> Specifically, Defendant claims that counsel should have argued the defense of entrapment because the police recorded a phone call made by the victim from the police station in which Defendant made incriminating statements. Additionally, Defendant claims that the use of this recording at trial violated Defendant's constitutional right not to testify against himself.

> Section 777.201, Florida Statutes, establishes the rules that apply to the test for entrapment. The statute, Munoz v. State, 629 So. 2d 90, 95 (Fla. 1993), and the standard jury instruction define the burdens which apply to a defense of entrapment: 1) the defendant must establish by a preponderance of the evidence that a government agent induced commission of the offense; 2) if the defendant meets that burden, then the defendant must produce some evidence that he or she was not predisposed to commit the offense; and 3) if the defendant produces this evidence, then the State must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime, both prior to and independent of the government acts.

> In the instant case, the defense of entrapment would not have been successful. Counts one, three and four had already been committed at the time that the phone call in question was made, so it was not possible for those offenses to have been induced by the call. Arguably, count two, contributing to the delinquency of a child, could have been committed during that phone call when Defendant encouraged the victim to lie to the police about what happened.[FN 3] However, "[t]he general rule is that entrapment will not lie where the inducement to commit a crime comes from a non-agent private citizen. That is, when a middleman, not a state agent, induces another person to engage in a crime, entrapment is not available as a defense." Worley v.

State, 848 So. 2d 491, 492 (Fla. 5th DCA 2003) citing State v. Hunter, 586 So. 2d 319, 321 (Fla. 1991). As the defense of entrapment would not have been meritorious, counsel was not deficient for failing to present the defense at trial.

> [FN 3: See Attachment 2, Information. In count two, Defendant was charge with contributing to the delinquency of a child by encouraging her to lie to law enforcement officers and or to engage in illegal sexual activity.]

> Moreover, the use of the recorded phone call at trial did not violate Defendant's right against self-incrimination. See Odom v. State, 403 So. 2d 936 (Fla. 1981) (defendant's Fifth Amendment rights against self-incrimination were not violated when witness wore a hidden transmitter to record conversation with defendant in which defendant made incriminating statements because there was no compulsion used and defendant's statements were purely voluntary). Defendant is not entitled to relief on this claim.

(Ex. O at 321–2). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. R).

This court must abide by the state court's interpretation of state law. See Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). Therefore, this court is bound by the state court's determination that a defense of entrapment would not have been meritorious. Defense counsel is not ineffective for failing to pursue a non-meritorious defense. Additionally, Petitioner's unsupported allegation that his statements were induced by threats from police is insufficient to demonstrate defense counsel had a meritorious basis for challenging admission of the conversation on Fifth Amendment grounds.

Petitioner failed to demonstrate that the state court's adjudication of this claim was contrary to or an unreasonable application of Strickland. Therefore, he is not entitled to habeas relief on Ground Two.

F.     Ground Two(a): "Again the Petitioner contends he was denied his Sixth Amendment right to effective assistance from his trial counsel when counsel failed to produce at trial a computer expert, denying the Petitioner due process."

Petitioner asserts during a pre-trial hearing on September 11, 2006, at which defense counsel sought to exclude e-mails exchanged between him and the victim, defense counsel stated he had conferred with a computer expert, who stated the reliability of the e-mails was questionable, because

the e-mails were not the original messages but instead copies of messages that had been forwarded numerous times to numerous recipients and thus potentially altered (doc. 1 at 45–47; *see also* Ex. C at 34–40). The court ruled that the issue of whether the e-mails were altered was a factual issue that went to the weight of the evidence, not its admissibility (*id.* at 45–46). Petitioner argues defense counsel was ineffective for failing to call the computer expert as a witness at the hearing, and had counsel done so, there is a reasonable probability the e-mails would have been excluded (*id.* at 46–47).

Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal (doc. 14 at 18–19).

    1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

    2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Two in his amended Rule 3.850 motion (Ex. N at 245–48). The state circuit court adjudicated the claim as follows:

> Defense counsel argued at a pre-trial motion hearing that certain incriminating emails should be suppressed and filed a written motion in limine to preclude the introduction of the emails[FN 4] The disputed emails had been forwarded twice, and counsel argued that the State could not prove that they had not been altered when they were forwarded. The motion was denied and the emails were admitted at trial.

> [FN 4: <u>See</u> Attachment 3, Motion in Limine to Preclude Introduction of Email Evidence.]

> Counsel also attempted to argue at trial that the emails could have been altered. However, Tonya [sic] Albert testified that she retrieved the emails from the victim's email account, and confirmed that the emails entered into evidence were the same as when she first found them, before they were forwarded.[FN 5] Therefore, even if an expert had testified that the emails could have been altered, Ms. Albert's testimony demonstrated that they were not.

> [FN 5: <u>See</u> Attachment 4, trial transcript excerpts, pp. 60–70.]

> Additionally, expert testimony should not be admitted unless the subject is beyond the common understanding of the average layman and the testimony will probably aid the trier of fact in its search for truth. <u>See</u> <u>Jones v. State</u>, 748 So. 2d 1012, 1025 (Fla. 1999). It is likely that an expert witness would not have been

appropriate because using email could be considered in the realm of common knowledge. Most people that know how to send an email are aware that the contents of a forwarded message can be altered.[FN 6]

> [FN 6:  Defendant has also not alleged that any of the emails were actually altered or how he was prejudiced by any alleged alterations to the emails.]

> As an expert witness would not have changed the outcome of the proceedings, counsel cannot be found deficient for failing to call one to testify at trial.  Defendant is not entitled to relief on this claim.

(Ex. O at 322–23).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. R).

Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference.  Chandler v. United States, 218 F.3d 1305, at 1314 n.14 (11th Cir. 2000) (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)).  If the record is not complete regarding counsel's actions, then the courts should presume "that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some reasonable lawyer might do."  Id. at 1314–15 n.15.  "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."  Waters, 46 F.3d at 1514.  "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."  Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

The only evidence of the substance of the proposed expert testimony is defense counsel's statement to the court during the pre-trial hearing that the expert would testify to "the implications of" forwarding e-mails (Ex. C at 40).  Assuming arguendo that one of the "implications" about which the computer expert would have testified was that an original e-mail message could be altered by a person forwarding it to another e-mail account, Petitioner failed to show a reasonable probability the outcome of the pre-trial hearing or the trial would have been different if counsel had attempted to call an expert to testify.  Defense counsel admitted in his motion in limine that "[i]t is well-known that emails can

be altered in the process of forwarding" (Ex. B at 224). Therefore, as the state court found, it is unlikely expert testimony would have been admissible under Florida law.

Further, Tanya Albert testified that the substance of the e-mails offered by the prosecutor at trial was identical to the originals she observed on the computer used by the victim (*see* Ex. E at 60–70).

Petitioner failed to show he was prejudiced by counsel's failure to present expert testimony, either at the pre-trial hearing or at trial, regarding the potential for altering forwarded e-mails. Therefore, he failed to demonstrate the state court's adjudication of this claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>.

G.    <u>Ground Two(b): "Petitioner was denied a fair trial and his constitutional right to effective assistance, based on counsel's failure to have obtain [sic] State's key witness's criminal history."</u>

Petitioner asserts defense counsel was aware that the victim had sex with at least three different adult men, and all of those men were prosecuted and incarcerated for having sex with a minor (doc. 1 at 47–48). Petitioner contends counsel rendered ineffective assistance by failing to obtain this information even though it was available to the defense (*id.*).

Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (doc. 14 at 19).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Three in his amended Rule 3.850 motion (Ex. N at 248–51). The state circuit court adjudicated the claim as follows:

> Defendant claims that at a pre-trial motion hearing, counsel was deficient because he had not investigated the criminal history of the victim.
>
> In fact, at that hearing, counsel made a motion for discovery, including discovery of "any information concerning convictions or pending or prior indictments of any state witness."[FN 7]
>
> [FN 7:  <u>See</u> Attachment 5, Demand for Disclosure of Material Favorable to Defendant.]

Apparently by the time of trial, counsel had received and reviewed this evidence, and made a pre-trial motion to allow testimony regarding the victim's history of prior arrests, sexual activity, sexual offender status, and history of being a runaway.[FN 8]  The Court allowed counsel to question the victim on a proffer,[FN 9], and then ruled that most of the testimony would be inadmissible.

> [FN 8:  See Attachment 4, pp. 6–17.  Defense counsel argued to the Court that the "rape shield statute" should not apply.  See also p. 9:  "I think from the age of thirteen to about the age of fifteen, she's had sex with at least three different adult men.  All three of them have been prosecuted and are in jail for sex with a minor."]

> [FN 9:  See Attachment 4, pp. 111–119.]

Defendant also states in the instant motion that counsel failed to obtain evidence that the victim was "repeatedly threatened to be deprived of her son if she didn't cooperate" with the police in the criminal investigation at issue.  However, at trial, counsel questioned the victim as well as the police witnesses regarding the victim's fear that her involvement could cause her child to be taken away by authorities.[FN 10]  In fact, the defense asserted that the victim's entire story was fabricated because she was afraid of losing her child if she did not satisfy the "overzealous" police.[FN 11]

> [FN 10:  Id. at pp. 159–172; 218–219; 226–228; and 231.]

> [FN 11:  Id. at pp. 51–52 and 328–329.]

The record reflects that counsel investigated the above-referenced evidence and attempted to bring it out at trial.  Therefore, Defendant's claim is without merit and must be denied.

(Ex. O at 323–24).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. R).

The record supports the state court's findings that by the time of trial, defense counsel had received and reviewed evidence of the victim's juvenile history and her history of sexual activity, as evidenced by the fact that counsel sought to admit this evidence at trial (see Ex. E at 6–17).  As discussed supra in Ground One(c), the trial court allowed counsel to question the victim on some of her juvenile history and her history as a runaway, but the court did not permit most evidence concerning her juvenile history, and it did not permit any evidence of her sexual history with other men.  Petitioner failed to show counsel performed unreasonably with respect to his investigation of

the victim's sexual and juvenile history. Further, he failed to show a reasonable probability the result of his trial would have been different had counsel conducted a more extensive investigation. Therefore, he failed to demonstrate the state court's adjudication of this claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>.

>    H.    <u>Ground Two(c): "Petitioner was denied a fair trial, and his due process right: equal protection as well as effective assistance of trial counsel based on counsel's failure to object to Count II of the information, reason, [sic] the information failed to allege facts that constituted 'sexual activity' as defined by statute."</u>

Petitioner asserts defense counsel was ineffective for failing to challenge Count 2 the amended information, charging contributing to the delinquency of a child, on the ground that it failed to allege facts that constituted "sexual activity" (doc. 1 at 49–50).

Respondent contends the state court's adjudication of Petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established federal law (doc. 14 at 19).

>    1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

>    2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Four in his amended Rule 3.850 motion (Ex. N at 251–53). The state circuit court adjudicated the claim as follows:

>    Defendant claims that counsel should have challenged the information as to count two, contributing to the delinquency of a child, because although it alleged that Defendant encouraged the victim to engage in illegal sexual activity, such activities were not specified.
>
>    "The purpose of an information is to fairly apprise defendant of the offense with which he is charged." <u>Leeman v. State</u>, 357 So. 2d 703, 705 (Fla. 1978). "Florida courts have consistently held that when an information cites a specific statute, the defendant is put on notice that he is charged with each of the elements of the offense contained in that statute." <u>Calloway v. State</u>, 37 So. 3d 891, 894 (Fla. 1st DCA 2010).
>
>    The information charged Defendant as to count two with contributing to the delinquency of a child by encouraging the victim to lie to law enforcement officers "and or" to engage in illegal sexual activity, in violation of section 827.04(1), Florida Statutes.[FN 12] Even if the "illegal sexual activity" portion of the charge would have

Case No.: 3:12cv115/LAC/EMT

been deleted, the State would have been able to prove the charge that Defendant encouraged the victim to lie to law enforcement officers.[FN 13]  Therefore, Defendant was not prejudiced by any inaction of counsel.

> [FN 12:  <u>See</u> Attachment 2.]

> [FN 13:  Defendant was recorded on a phone call with the victim, which was played at trial, instructing her to lie to police regarding the sexual activity that happened between them.]

Moreover, a motion to dismiss the charge due to an allegedly defective information would not have been granted.[FN 14]  <u>See</u> Fla. R. Crim. P. 3.140(o) (it is appropriate to dismiss a count if the information "is so vague, indistinct and indefinite as to mislead the accused and embarrass him or her in the preparation of a defense.")  Accordingly, counsel was not deficient for failing to make such a motion and Defendant is not entitled to relief on this claim.

> [FN 14:  Practically speaking, if the defense objected to the information, the Court would have permitted the State to amend the information if necessary.]

(Ex. O at 324–25).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. R).

In light of the state court's conclusion that a motion to dismiss Count 2 of the charging document would not have been properly granted under state law, a conclusion to which this federal court must defer, Petitioner failed to show counsel performed deficiently by failing to seek dismissal on the ground that the information failed to allege facts that constituted "sexual activity." Further, there is no reasonable probability Petitioner would <u>not</u> have been convicted of Count 2 if counsel had sought dismissal of the charge, because the evidence was sufficient to satisfy the alternative factual basis for the charge, that is, that Petitioner encouraged the victim to lie to police during their investigation of the other charges.

Petitioner failed to demonstrate that the state court's adjudication of this claim was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to habeas relief on Ground Two(c).

I.    <u>Ground Two(d)</u>:  "<u>Petitioner was denied effective assistance of trial counsel as mandated by the Sixth Amendment of the U.S. Const. because his lawyer failed to object or even challenged [sic] motion to transfer case from Okaloosa to Walton.</u>"

Petitioner contends defense counsel should have objected to the State's motion to transfer venue of the case from Okaloosa to Walton County, Florida (doc. 1 at 51–52). He contends he was prejudiced by the change of venue, because the Walton County court ignored the pre-trial rulings of the Okaloosa County court, and the theory of defense was "cut in half" by the Walton County court's rulings at trial (doc. 19 at 24). Petitioner argues the state court did not adjudicate the merits of this claim, because the First DCA affirmed the state circuit court's decision per curiam without written opinion, which does not constitute an adjudication on the merits for purposes of § 2254 (doc. 1 at 51–52).

Respondent contends the state court denied this ground as facially insufficient even after Petitioner had an opportunity to amend his Rule 3.850 motion (doc. 14 at 20). Respondent contends this was a state procedural ruling that constituted an independent and adequate state law ground for denying relief (*id.*). Therefore, the claim is procedurally defaulted for federal habeas purposes (*id.*).

 The state circuit court's denial of the claim as facially insufficient, because Petitioner's allegations of prejudice were conclusory, constituted an adjudication on the merits. In disposing of the claim, the state court considered the sufficiency of the claim, focusing on the factors for determining whether the claim was sufficient to warrant relief under Strickland (*see* Ex. O at 326–27). There is no indication the court applied a state procedural rule in disposing of the claim. Further, the First DCA's simple one-word affirmance is presumed to be an adjudication on the merits of the claim, unless there is a reason to think some other explanation for the state court's decision is more likely, a showing that Petitioner has not made here. *See* Shelton v. Sec'y, Dep't of Corr., 691 F.3d 1348, 1353 (11th Cir. 2012) (citing Harrington, 131 S. Ct. at 785). The undersigned therefore concludes the state courts' disposition was an adjudication on the merits, and Petitioner's claim is not procedurally barred or otherwise unexhausted. *See* Borden v. Allen, 646 F.3d 785, 808–16 (11th Cir. 2011) (rejecting district court's conclusion that petitioner's ineffective assistance of counsel claims were procedurally barred where state court ruled that petitioner's vague assertions and unsupported conclusions were insufficient to withstand summary dismissal because they failed to contain the required specificity and full disclosure of the factual basis, and holding that state court's disposition was an adjudication on the merits; therefore, review of state court decision under deferential standard of AEDPA was appropriate).

1. Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2. Federal Review of State Court Decision

Petitioner raised this claim as Ground Five in his amended Rule 3.850 motion (Ex. N at 254–56). The state circuit court adjudicated the claim as follows:

> Defendant claims that after the case was transferred to Walton County, the trial was before "an honorable judge who the defendant and do [sic] to his previous employment had several meetings." Defendant further claims that he expressed his concerns to counsel who "inexplicably failed to act." Defendant avers that a "conflict" arose because: 1) he had previously testified before the Court "against people that he had arrested;" 2) "of the age and nature of the offense;" 3) "he was denied a fair trial;" 4) all pre-trial motions were heard by a different judge; 5) defendant was denied equal protection of the law; 6) the transfer contributed to the guilty verdicts; and 7) the transfer "was in essence a bad move and created bad character for the defense."
>
> First, this claim is facially insufficient as Defendant has not provided the requisite factual details for the Court to evaluate the claim. Defendant has been given leave to file an amended motion, and therefore this claim may now be properly denied as facially insufficient.[FN 15] Additionally, it appears that Defendant is confusing the issues of venue and the alleged bias of a particular judge. Many of Defendant's allegations relate to his contention that it was inappropriate for his case to be heard by this specific Court, however that claim is unrelated to any reason that counsel would have had to object to the motion for change of venue.
>
> [FN 15: See Attachment 6, orders filed March 12, 2010, and December 22, 2010, granting Defendant leave to amend (without attachments).]
>
> It appears that the State had proper grounds for the change of venue, and Defendant has not articulated how he was prejudiced by the transfer.[FN 16] Therefore, counsel was not deficient for failing to object and Defendant is not entitled to relief.
>
> [FN 16: See Attachment, Motion to Transfer.]

(Ex. O at 326–27). Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. R).

Petitioner's conclusory allegation that the trial court ignored the pre-trial rulings of the Okaloosa County court (an allegation which is not supported by the record) and entered rulings

unfavorable to the defense is insufficient to show a reasonable probability the result of trial would have been different if counsel had opposed the change of venue. Moreover, Petitioner failed to show that counsel had a meritorious basis for objecting to the State's motion to transfer, which, according to the state court, was properly supported. Therefore, Petitioner failed to demonstrate the state court's adjudication of this claim was unreasonable under Strickland.

      J.     Ground Two(e): "Petitioner was denied a fair trial, based on trial counsel's ineffectiveness, by opening the door to allow evidence that had been excluded to be introduced, in violation of the 5th, 6th, and Fourteenth Amendments to the U.S. Constitution."

      Ground Two(f): "Petitioner was denied effective assistance of trial counsel, and the state courts applied Strickland incorrectly when considering the facts as explained, in violation of Petitioner's due process."

Petitioner asserts defense counsel was ineffective for "opening the door" to the prosecutor's eliciting "Williams rule" evidence that had previously been ruled inadmissible, specifically, evidence regarding sexual contact between the victim and Petitioner in a parking lot of an Olive Garden restaurant (doc. 1 at 53). Petitioner additionally claims counsel was ineffective for failing to object and move for mistrial when the prosecutor violated a pre-trial ruling precluding witnesses and counsel from referring to the victim as "the victim" during trial (in Petitioner's amended Rule 3.850 motion, he alleged that the prosecutor's reference to "the victim" occurred during voir dire (see Ex. N at 260)) (id. at 54).

Respondent contends the state court's adjudication of Petitioner's claims was not contrary to or an unreasonable application of clearly established federal law (doc. 14 at 21–22).

      1.     Clearly Established Federal Law

The Strickland standard, set forth supra, governs this claim.

      2.     Federal Review of State Court Decision

Petitioner raised these claims as Grounds Six and Six(a) in his amended Rule 3.850 motion (Ex. N at 256–61). The state circuit court adjudicated the claims as follows:

      Before trial, counsel successfully sought to exclude testimony from the trial about events that transpired between Defendant and the victim.[FN 17] The events were referred to as "the Olive Garden incident." At trial defense counsel questioned the victim about Defendant driving her to a doctor's appointment for her son.[FN 18] The "Olive Garden incident" had occurred after the appointment. The State then argued that the defense had opened the door for the "Olive Garden incident" to come

into evidence at trial.[FN 19]  After a proffer outside the presence of the jury, the Court disagreed, and disallowed the evidence form being heard by the jury.[FN 20] Therefore, Defendant suffered no prejudice by counsel's questioning of the victim, and he is not entitled to relief on this claim.

[FN 17: See Attachment 8, Defendant's Objection to State's Notice of Intent to Utilize Williams Rule and Motion to Strike.]

[FN 18: See Attachment 4, pp. 135–136.]

[FN 19: Id. at pp. 140–142.]

[FN 20: Id. at pp. 143–145.]

Defendant also alleges in this ground, or what is referred to in the instant motion as "Ground Six (a)," that counsel was deficient for failing to make a motion for mistrial when during voir dire the State referred to the victim as "the victim," although the defense's motion in limine had been granted which precluded references to "the accuser as the 'victim.'"[FN 21]

[FN 21: See Attachment 9, Motion in Limine to Preclude References to the Accuser as the "Victim."]

After having reviewed the transcript of the voir dire, it appears that the prosecutor inadvertently referred to the victim as "the victim" only one time.[FN 22] Shortly thereafter, defense counsel pointed out this misstatement to the Court and the prosecutor at a bench conference; stated that he did not want to interrupt by objecting, but that he would move for a mistrial if it happened again.[FN 23]  The prosecutor stated that the reference was unintentional and the Court admonished him, "Don't do it again."  Therefore, the record demonstrates that counsel did not object as a matter of strategy, because the objection would have been likely to draw the venire's attention to the reference.  Moreover, even if counsel had objected and the objection had been sustained, it would not have changed the outcome of the proceedings. Consequently, Defendant is not entitled to relief on this claim.

[FN 22: See Attachment 10, voir dire transcript excerpt, p. 14.]

[FN 23: Id. at pp. 20–21.]

In order for Defendant to prove that counsel was deficient, he must demonstrate that counsel's errors were *so serious as to deprive the defendant of a fair and reliable trial.*  This standard has been reiterated by Florida courts many times.  See Mongo v. State, 846 So. 2d 613, 614 (Fla. 1st DCA 2003) (citing e.g. Thompson v.

> State, 759 So. 2d 650 (Fla. 2000)).  The Court does not find that Defendant has met his burden as to the deficiency prong of the Strickland test.  See also Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986) (acts worthy of postconviction relief must be "outside the broad range of reasonably competent performance under prevailing professional standards.")  Additionally, Defendant has not proved that he was prejudiced by any action or inaction by counsel, and therefore, his claim of ineffective assistance of counsel fails.

(Ex. O at 327–28).  Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. R).

The state court's findings of fact are supported by the record.  Prior to trial, the court ruled that evidence of sexual contact between Petitioner and the victim in the parking lot of an Olive Garden restaurant was inadmissible (see Ex. A at 57–62, Ex. C at 43).  During trial, defense counsel questioned the victim regarding whether Petitioner said or did anything inappropriate to her when he drove her to her son's doctor appointment (the "Olive Garden incident" allegedly occurred after the doctor's appointment) (Ex. E at 135–36).  Outside the presence of the jury, the prosecutor announced he intended to adduce testimony from the victim regarding the "Olive Garden incident," because defense counsel had "opened the door" (id. at 140–45).  The trial court ruled defense counsel did not "open the door"; therefore, the prosecutor was not permitted to adduce testimony from the victim regarding the incident (id. at 145).  Since the jury did not hear evidence of the "Olive Garden incident," Petitioner failed to show he was prejudiced by defense counsel's alleged error.

Also prior to trial, the trial court granted defense counsel's motion in limine seeking to preclude references to the accuser as the "victim" (see Ex. A at 75–81, Ex. C at 45).  As the state court found, the prosecutor made a single reference to the "victim" during voir dire when he asked, "The victim in this case will be Ms. [R.S.]  Does anyone know [R.S.] from Fort Walton Beach, Florida?" (Ex. D at 14).  At the conclusion of the prosecutor's voir dire, defense counsel requested a bench conference during which he advised the court that the prosecutor had violated the court's pre-trial ruling (id. at 21).  Defense counsel stated, "I didn't want to object at the time; I didn't want to interrupt the Court.  But I wanted the Court to know that the next time, I will ask for a mistrial." (id.).  The prosecutor responded, ". . . if I did it, it was a mistake . . . I certainly didn't intend to do it." (id.).  The court admonished the prosecutor, "Don't do it again." (id.).

Petitioner failed to show that defense counsel's tactical decision to not object or move for mistrial upon the prosecutor's single, inadvertent misstatement was unreasonable.  An objection at the outset of voir dire, when potential members of the jury were forming first impressions of the participants, may have been perceived by the panel as obstructionist, and any benefit to the defense likely would have been far outweighed by the cost of additional emphasis drawn to the statement by a curative instruction.  Further, Petitioner did not allege any facts suggesting the prosecutor's single reference affected the impartiality of the panel or predisposed any of the jurors toward the prosecution.  Therefore, he failed to show a reasonable probability the result of the proceeding would have been different if defense counsel had objected to the prosecutor's single misstatement during voir dire, or moved for a mistrial, or both.

Petitioner failed to demonstrate that the state court's adjudication of Grounds Two(e) and Two(f) were based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to federal habeas relief.

## V.     CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 12th day of February 2013.


                              /s/ *Elizabeth M. Timothy*
                              **ELIZABETH M.  TIMOTHY**
                              **UNITED STATES MAGISTRATE JUDGE**



### NOTICE TO THE PARTIES

        Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).

Case No.:  3:12cv115/LAC/EMT